FILED

06 OCT 31 AM 9:00

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

In re
DENISE E. WRIGHT,

Debtor.

GREGORY A. AKERS,

Appellant,

v.

THOMAS A. GEVISS,

Appellee.

CASE NO. 06-CV-0686 W

**ORDER REMANDING TO BANKRUPTCY COURT**

BANKR. NO. 04-06310-A7
ADV. NO. 04-90454-LA

Appellant Gregory A. Akers, Trustee, appeals from the United States Bankruptcy Court's judgment denying his avoidance claim. Appellee Thomas A. Geviss, Debtor Denise E. Wright's former spouse, opposes. The Court **REVERSES** the judgment and **REMANDS** for further proceedings.

# I. FACTUAL AND PROCEDURAL BACKGROUND

This case comes to the Court on appeal from the bankruptcy court. 28 U.S.C. § 158(a)(1) and (c)(1)(A) provide appellate jurisdiction to district courts over bankruptcy cases. The appeal presents one question: whether the bankruptcy court properly concluded that Debtor did not fraudulently transfer her interest in the family residence to Appellee. The facts of this case are set forth fully in the Bankruptcy Court's Findings of Fact and Conclusions of Law ("Findings"). (R. Ex. 22.) A synopsis of relevant facts follows.

Debtor and Appellee were married for approximately four and one-half years before their marriage terminated in a divorce. On December 15, 2002, Debtor and Appellee filled out a Petition for Dissolution online. On January 13, 2003, Debtor filed the completed petition. On January 14, Debtor and Appellee executed a Marital Settlement Agreement ("MSA") designed to settle their obligations as to their property and debts. The MSA provided that Appellee would refinance the parties' residence at 2249 Boulders Court, Alpine, California ("Residence"), and pay Debtor $45,000 from the proceeds. In exchange, Debtor would execute a quitclaim deed to Appellee.[1] Debtor and Appellee also agreed not to incur any further debts for which the other would be liable, and that they would hold harmless and indemnify the other against any liability for debts incurred after the effective date of the agreement.[2] On February 6, Debtor filed the MSA with the Superior Court. On the same day, the Superior Court entered a judgment of dissolution.

//

//

[1] Debtor and Appellee decided on the $45,000 figure based on advice from the Debtor's realtor friend that the Residence had $90,000 of equity. (Findings at 4.)

[2] The MSA stated it would become effective either when the court approved it in the pending dissolution proceeding, or on the date final judgment was entered. Based on the record below, it does not appear the MSA was approved by any court prior to the date final judgment was entered. Accordingly, the effective date of the agreement is February 6, 2003.

Between December 2002 and March 2003, Debtor continued to cook and do laundry for the family and to pick up Appellee's daughters from school. Debtor and Appellee continued to deposit their paychecks into a joint account for the payment of joint bills. Debtor moved out of the Residence sometime in March 2003.

Appellee was unable to refinance the Residence in his name alone as contemplated by the MSA. As an accommodation, Debtor agreed to remain a co-obligor on the refinance for one year. In May 2003, Debtor and Appellee refinanced the Residence as co-obligors. They received approximately $46,000 in net proceeds from the refinance. The parties used some of the proceeds to pay various loans and debts, including a $19,418 car loan. Sometime around May or June 2004, Appellee again attempted to refinance in his name, but was unable to. Instead, he performed repairs on the Residence to prepare it for sale. On June 10, 2004, a grant deed was recorded showing Debtor had conveyed her interest in the Residence to Appellee. He received $237,823.83 in net proceeds from the sale in August 2004.

On July 16, 2004, Debtor filed for Chapter 7 relief. The bankruptcy court appointed Appellant her Chapter 7 Trustee. On October 20, 2004, Appellant filed a fraudulent transfer and breach of contract action against Appellee. In an order granting partial summary judgment, the bankruptcy court resolved four issues: (1) the grant deed transferred to Appellee some residual interest that Debtor retained in the Residence; (2) the transfer occurred within weeks of filing bankruptcy; (3) the transfer rendered Debtor insolvent; and (4) Debtor personally received no proceeds from the sale of the Residence.

The Court reserved two issues for determination at trial: the parties' separation date under California law, and the extent of Debtor's interest in the Residence at the time she executed the grant deed. On the first issue, the court reasoned that In re Marriage of Norviel, 102 Cal. 4th 1152 (2002), did not control. It found "considerable factual support" for a separation date of December 15, 2002, but determined that it should hear "all evidence and circumstances relating to this issue." (R. Ex. 12.)

After trial, the bankruptcy court concluded that Debtor did not fraudulently transfer her interest in the Residence. The court reasoned that she received reasonably equivalent value for her equitable interest in the Residence from the proceeds of the refinance. Further, she received reasonably equivalent value for the quitclaim deed because she held only bare legal title, an interest with no value, when she executed the deed. Accordingly, the bankruptcy court entered judgment against Appellant on his avoidance claim.[3] On March 29, 2006, Appellant timely filed a notice of appeal.

## II. STANDARD OF REVIEW

A district court reviews a bankruptcy court's factual findings for clear error. See Spieker Props., L.P. v. MFM The SPFC Liquidating Trust, 268 F.3d 712, 715 (9th Cir. 2001) (citing Beaupied v. Chang, 163 F.3d 1138, 1140 (9th Cir. 1998)). "Findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge credibility of the witnesses." Richmond v. United States, 234 B.R. 787, 790 (S.D. Cal. 1997) (quoting Fed. R. Bankr. P. 8013). In other words, an appellate court must accept factual findings unless the court is left with the "definite and firm conviction that a mistake has been committed." Hunt v. Cromartie, 532 U.S. 234, 242 (2001); see also United States v. Hughes Aircraft Co., 162 F.3d 1027, 1030 (9th Cir. 1999).

However, a bankruptcy court's judgment is reviewed "de novo" for legal conclusions and mixed questions of law and fact. Spieker Props., L.P., at 715. The appellate court may reverse if the lower court chose the incorrect legal standard, or applied the standard improperly. Id.

//

//

//

---

[3] The bankruptcy court also entered judgment against Appellee on his breach of contract claim, but Appellee has not appealed that portion of the judgment.

## III. ANALYSIS

Appellant seeks to set aside Debtor's transfer of her interest in the Residence to Appellee. A trustee may avoid a transfer of the interest of a debtor in property that was made or incurred within two years before the date of the filing of the petition if the debtor, voluntarily or involuntarily, received less than a reasonably equivalent value in exchange for such transfer or obligation; and was insolvent on the date that such transfer was made, or became insolvent as a result of such transfer or obligation. 11 U.S.C. § 548(a)(1).

### A. Debtor May Not Have Received Reasonably Equivalent Value for Her Equitable Interest.

Appellant argues that the bankruptcy court erroneously found that Debtor received reasonably equivalent value in exchange for the grant deed because she held more than bare legal title to the Residence. (Appellant's Br. at 12; Findings at 8–9.) Debtor and Appellee agreed that Debtor would accept $45,000 for her interest in the Residence. Appellant does not argue that $45,000 is not reasonably equivalent value for Debtor's interest in the Residence. Rather, Appellant contends that Debtor never actually received $45,000 in value from Appellee.

According to the bankruptcy court, Appellee "cashed out" Debtor's $45,000 interest in the Residence prior to the execution of the grant deed by using the refinance proceeds to pay off some of Debtor's separate debts and performing various services for her. (Findings at 9.) The bankruptcy court found that Appellee gave the Debtor $45,000 in value through the following transactions:

- $17,000 payment of Debtor's credit card debt;
- $19,418 payment of Debtor's car loan;
- services rendered to Debtor's father;
- miscellaneous adjustments concerning Debtor and Appellee's checking account;

- a credit from Debtor to Appellee for his separate property business "Action Turbo;" and
- Appellee's performance of labor on Debtor's new home. (Id. at 5–6.)

The bankruptcy court apparently found Debtor separately responsible for the credit card debt and car loan. (See id. at 5, 8–9.)

Appellant argues that the car loan and approximately $1,000 of the credit card debt were joint debts. If so, only half of the amount of those payments should have been credited against the $45,000, and Appellee's payment to Debtor would have been approximately $9,000 short of $45,000. (Appellant's Br. at 13.) Thus, if the car loan and any portion of the credit card debt were joint debts, the value Debtor received for her equitable interest would be diminished significantly.

The Court reviews de novo the legal question whether the cash transfers and services Debtor received constituted reasonably equivalent value for her equitable interest. To do so, the Court must also consider de novo the question whether debts incurred between a separation date recited in an MSA and the date spouses actually separate are joint or community debts.

***The Bankruptcy Court Did Not Properly Apply California Law to Determine Whether the Debts Were Joint or Separate Liabilities.***

Under Family Code section 910(a), "the community estate is liable for a debt incurred by either spouse before or during marriage . . . regardless of whether one or both spouses are parties to the debt." Thus, California community property laws do not allow spouses to avoid liability for community debts simply by keeping accounts in separate names. And as the Court will explain, they do not permit spouses—even spouses who intend to separate in the near future—to avoid liability for community debts through their own agreement. See In re Marriage of Norviel, 102 Cal. App. 4th 1152, 1162 (2002); In re Marriage of Hardin, 38 Cal. App. 4th 448, 452 (1995). Consequently, because a bankruptcy trustee may set aside a transfer even if the debtor

*voluntarily* received less than reasonably equivalent value, an agreement between the parties does *not* render the transfer immune from the trustee's avoidance powers. Therefore, the Court must remand so the bankruptcy court may consider whether the payments and services were, on the whole, reasonably equivalent value for the Debtor's interest in the Residence.

To determine the value Debtor received, the bankruptcy court analyzed the parties' accountings in detail. The accountings showed that Appellee agreed to pay $21,000 on the car loan[4] and $8,000 in credit card debt instead of directly paying her $45,000 out of the refinance proceeds. (Findings at 5.) Instead of ascertaining exactly how much value Debtor received when Appellee paid the car and credit card debts, the bankruptcy court apparently relied on Debtor's agreement in the accountings and treated the loan payments as payments to Debtor. (Findings at 5.) While these accountings show that Debtor *agreed* the debts were hers, the agreement does not make it so. Debtor may have thought she was solely liable for the debts—but California law determines their character, not her agreement. So even if she agreed to be "cashed out" through the payment of debts for which she was only fifty percent liable, the trustee may still recover what she exchanged if she received less than reasonably equivalent value. See 11 U.S.C. § 548(a)(1).

***The Bankruptcy Court Should Have Determined the Parties' Separation Date Under California Law.***

Because Debtor incurred some of the satisfied debts after the parties filled out the dissolution petition and executed the MSA, the question arises whether the parties were separated under California law. Section 910 of the Family Code holds the community estate liable for debts incurred "during marriage." "'During marriage' for

---

[4] The bankruptcy court stated in a prior section of its Findings that Appellee paid the car loan in full by paying $19,418. The Court believes the parties estimated the car loan to be $21,000 in their accountings and that this estimate accounts for the inconsistency in the figures.

purposes of this section does not include the period during which the spouses are living separate and apart before a judgment of dissolution of marriage or legal separation of the parties." Fam. Code § 910(b). Accordingly, the parties began incurring separate debt on the earlier of two dates: (1) the date the family court entered the judgment of dissolution, or (2) the date they began living separate and apart.

As discussed below, the Court concludes that the bankruptcy court's failure to apply section 910 and relevant case law to determine the nature of the debts was erroneous. Therefore, the Court remands to the bankruptcy court to consider this issue under the correct legal standard.

California courts have interpreted "living separate and apart" to mean "a condition where the spouses have come to a parting of the ways and have no present intention of resuming the marital relations and taking up life together under the same roof." Norviel, 102 Cal. App. 4th at 1162 (citing Makeig v. United Security Bank & Trust Co., 112 Cal. App. 138, 143 (1931)). Courts must determine whether the "parties' conduct evidences a complete and final break in the marital relationship." In re Marriage of Baragry, 73 Cal. App. 3d 444, 448 (1977). "Because rifts between spouses may be followed by long periods of reconciliation, and the intentions of the parties may change from one day to the next," legal separation occurs when two elements are met simultaneously: (1) a lack of intention to resume marital relations, and (2) conduct evidencing a complete and final break. Hardin, 38 Cal. App. 4th at 451 (italics omitted).[5]

The bankruptcy court properly reserved the separation date, a factual issue, for trial. But it expressly rejected Norviel as the governing legal standard. Norviel defined the phrase "living separate and apart" to determine the character of assets acquired during marriage. The bankruptcy court did not explain why Norviel would not control

---

[5] The Ninth Circuit has also recognized that "legal separation occurs under California law when the spouses 'have come to a parting of the ways with no present intention of resuming marital relations.'" Minasyan v. Gonzales, 401 F.3d 1069, 1078 (9th Cir. 2005).

the interpretation of the identical statutory phrase to determine the character of debts—with or without an agreement as to their character—and the Court sees none.

Further, the court used a totality-of-the-circumstances approach to determine the date of separation. This also suggests legal error. Baragry, Hardin, and Norviel establish two indispensable elements of legal separation. The bankruptcy court's analysis should have focused on all facts relevant to these two elements, and it should have ascertained that both elements were present.

On the first element, only "factors bearing on either party's intentions 'to return or not to return to the other spouse' are to be considered." Hardin, 38 Cal. App. 4th at 452 (quoting Dalton v. Metropolitan Prop. & Liab. Ins. Co., 136 Cal. App. 3d 1037 (1982)). "No particular facts are per se determinative." Id. Factors such as frequency of contact between the parties, parties' ongoing economic, sexual and social ties, filing of joint tax returns, and any attempts at reconciliation should be considered among other evidence. Hardin, 38 Cal. App. 4th at 452–453. Ultimately, courts should objectively consider all evidence relating to the subjective intent of the parties to return or not to return to the other spouse. Id. at 452.

On the second element, "living separate and apart physically is an indispensable threshold requirement to separation." Norviel, 102 Cal. App. 4th at 1162. Typically, this requires that each spouse take up residence at a different address. Id. at 1163. Although a couple may live apart physically while occupying the same dwelling, they are not legally separated without "unambiguous, objectively ascertainable conduct amounting to a physical separation under the same roof." Id. at 1164.

Especially relevant here is that "the filing of a dissolution petition or recitations in a marital settlement agreement do not by themselves compel a finding the parties were thereafter living separate and apart," Hardin, 38 Cal. App. 4th at 452, and that the date a party leaves the family residence does not solely determine the separation date, id.

//

On remand, several of the bankruptcy court's findings will be relevant to this inquiry. For example, "Debtor and Defendant continued to deposit their paychecks into a joint account for the payment of joint bills," "Debtor did not move out of the family residence until sometime in March 2003," and "Debtor continued to cook meals for the family, do laundry, and pick up Defendant's daughters from school." (Findings at 2–3.) On remand, the bankruptcy court might still conclude that the parties were living separate and apart in the same dwelling. But additional findings of fact showing unambiguous, objectively ascertainable separation would be required to support that conclusion.

***The Bankruptcy Court's Implicit Reliance on the Separation Date in the Petition for Dissolution Was Erroneous.***

In the section discussing the Trustee's breach of contract claim, the bankruptcy court adopted the separation date stated in the dissolution petition and incorporated into the family court's judgment of dissolution. (Findings at 10.) It may have also implicitly relied on this date as the parties' separation date to determine who was liable for the car loan and increase in credit card debt.

As the bankruptcy court explained:

> Family Code § 910 determines the character of debts as community debts or separate debts when there is no mutually agreed upon date of separation. . . . In this case Debtor and Defendant mutually agreed the date of separation was December 15, 2002. There is no evidence they changed this agreement; nor did either side ever move to have this agreed upon date set aside. . . . The agreed upon date of separation is stated in the dissolution petition and incorporated into the final dissolution judgment. The Court is not persuaded it should disturb this date.

(Findings at 10.) The bankruptcy court made these statements in its general findings of fact as well as its conclusions of law on the breach of contract issue. They suggest that the bankruptcy court may have relied on separation date the parties agreed upon

and the family court incorporated without determining for itself whether this was the correct separation date under California law. Assuming the bankruptcy court did implicitly rely on December 15, 2002, as the separation date to determine the character of the debts, the Court has already mentioned that the date stated in the separation petition is not necessarily the legal separation date.

From the parties' briefings below, it appears that the bankruptcy court might have determined that the doctrine of collateral estoppel precluded further inquiry as to the separation date. If so, the bankruptcy court must clarify the basis for this conclusion.[6] While the question is not before the Court here, it pauses to note that collateral estoppel may not bind the trustee under certain circumstances. See, e.g., Ingalls v. Erlewine, 349 F.3d 205, 210 (5th Cir. 2003); Corzin v. Fordu, 201 F.3d 693, 705 (6th Cir. 1999) (trustee found not in privity with debtor because he represents the rights of the debtor's creditors who were not parties to a consent judgment and whose interests were not represented by the debtor).

Therefore, on remand, the bankruptcy court must make further findings of fact to determine precisely how much of the $45,000 satisfied debts for which the community was liable. At that point, the court can properly determine how much value Debtor directly or indirectly received in cash. Finally, the court must determine afresh whether all of the value Debtor received constitutes "reasonably equivalent value" for her equitable interest under the Bankruptcy Code.

//

//

---

[6] "California courts will apply collateral estoppel only if certain threshold requirements are met, and then only if application of preclusion furthers the public policies underlying the doctrine." Harmon v. Kobrin, 250 F.3d 1240, 1245 (9th Cir. 2001). The five threshold requirements are: (1) the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding; (2) this issue must have been actually litigated in the former proceeding; (3) it must have been necessarily decided in the former proceeding; (4) the decision in the former proceeding must be final and on the merits; (5) the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. Id.

### B. The MSA Served as a "Writing" Under the Family Code.

Appellant's second argument is that Debtor's interest in the Residence could not have become bare legal title without a signed writing by Debtor under Family Code section 852. (Appellant's Br. at 9.) Section 852 states that a "transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected." Appellant argues that the MSA could not have served as the required writing because Appellee failed to refinance the Residence in his name as required by the MSA. (Appellant's Br. at 10–11.) Thus, Debtor did not agree to transmute her interest in the house while remaining liable for the mortgage. (Id.)

The Cou rt d isagrees. "A transmutation is an interspousal transaction or agreement that works a change in the character of the property." In re Marriage of Cross, 94 Cal. App. 4th 1143, 1147 (2001). Meeting the writing requirement of section 852 "requires only a clear demonstration of a change in ownership or characterization of the property at issue." In re Marriage of Barneson, 69 Cal. App. 4th 583, 593 (1999). Debtor's transfer of her interest in the Residence to Appellee was a classic transmutation because Debtor was transferring her joint tenancy interest in the Residence to Appellee's separate property. However, the parties' written agreement in the MSA stating Debtor would quitclaim her interest in the Residence to Appellee after he refinanced the house in his name and paid Debtor $45,000 was a sufficient written transmutation of Debtor's equitable interest in the Residence.

Although Appellee did not refinance the Residence solely in his name, as required by the MSA, "Debtor agreed, as a temporary accommodation and in furtherance of the MSA terms, to remain on title even though Defendant cashed out her interest." (Findings at XX.) Furthermore, the MSA accomplishes section 852's purpose of increasing certainty "in the determination whether a transmutation has in fact occurred." Hanf v. Summers, 278 B.R. 808, 813 (9th Cir. 2002). Section 852 only serves to "eliminat[e] . . . ex-post facto disagreements, misunderstandings, and

uncertainties." Because the MSA is a formal, written agreement making it clear that a transmutation between Debtor and her ex-husband had occurred, it is irrelevant that Debtor later agreed to accommodate Appellee.

Appellant argues that the bankruptcy court's finding that Debtor agreed to remain liable on the refinance loan even after her interest had been cashed out is unsupported by the record. (Appellant's Br. at 11.) Because this finding of fact is not clearly erroneous, the Court declines to disturb it. In light of the parties' relationship and the circumstances of this case, it appears plausible that Debtor agreed to remain a co-obligor on the mortgage in order to "get the $45,000 out of the residence" without forcing Appellee to sell the home. (Findings at 4.) Besides arguing that it would be illogical for Debtor to agree to make this accommodation, Appellant does not offer any evidence to persuade the Court that this was an erroneous finding. In fact, the very testimony Appellant offers appears to support that very finding.[7]

Weighing the evidence and evaluating testimony is the prerogative of the trial court. Thus, the Court declines to disrupt the bankruptcy court's findings of fact. Further, because Appellant did not appeal his breach of contract claim, the Court finds it improper for Appellant to raise equivalent arguments here. Since Debtor agreed to remain liable on the refinance temporarily, the MSA serves as the required written transmutation.

Finally, Appellant argues that under Family Code section 852(b) a transmutation would not be effective against a third party such as himself because it was not recorded. The Court finds this argument meritless because the grant deed was executed and recorded before Debtor filed bankruptcy.

//

---

[7] Appellant argues that "Debtor testified that Appellee asked her to be liable for the refinance loan with him, and she agreed because she did not want to have to sell the Residence and disrupt the lives of Appellee's daughters. This does not support the Bankruptcy Court's finding that 'Debtor agreed, as a temporary accommodation and in furtherance of the MSA terms, to remain on title even though Defendant cashed out her interest.'" (Appellant's Br. at 11.)

**C. Transferring the Grant Deed Did Not Render Debtor Insolvent Because Bare Legal Title Has No Economic Value.**

Appellant argues that Debtor could not have become insolvent by transferring her joint tenancy interest in the Residence via the grant deed while holding bare legal title in the Residence at the time she deeded the Residence to Appellant. The Court agrees.

Bare legal title to property is an interest that has "no value whatsoever." Dunham v. Kisak, 192 F.3d 1104, 1106 (7th Cir. 1999); see also Mid-Atl. Supply, Inc. v. Three Rivers Aluminum Co., 790 F.2d 1121, 1125 (4th Cir. 1986) ("Legal title alone is of no value to the estate . . . ."). Accordingly, when the bankruptcy court found that Debtor transferred bare legal title to Appellee when she executed the grant deed, it found that Debtor transferred an interest with no economic value.

Nevertheless, at summary judgment, the bankruptcy court concluded that the transfer of the grant deed rendered Debtor insolvent. Together, the bankruptcy court's findings amount to a conclusion that Debtor was rendered insolvent when she transferred an interest to Appellee with no economic value. This cannot be. Either Debtor transferred an interest with value, or the transfer did not render her insolvent because she transferred nothing of value. On remand, the bankruptcy court should revisit its findings and legal conclusions regarding her legal interest after it determines whether she received reasonably equivalent value for her equitable interest.

//

//

//

//

//

//

//

//

## IV. CONCLUSION AND ORDER

The Court **REVERSES** the bankruptcy court's judgment and **REMANDS** this matter for further proceedings.

**IT IS SO ORDERED.**

**DATE: October ~~27~~ 30, 2006**

**Hon. THOMAS J. WHELAN**
United States District Court
Southern District of California

CC: ALL PARTIES AND COUNSEL OF RECORD
HON. LOUISE DE CARL ADLER, BANKRUPTCY JUDGE